(52 Misc. Rep. 394)

### SARASOHN v. KAMAIKY et al.

(Supreme Court, Special Term, New York County. January, 1907.)

SPECIFIC PERFORMANCE—CONTRACTS—EVIDENCE.

    Plaintiff sued to compel specific performance of a contract, alleging that on his agreement to marry in accordance with the father's wishes, and to take charge of his father's interests in a newspaper during his father's absence, and to cancel a mortgage he held on his father's property, his father agreed to bequeath to him one-fourth of his newspaper business, one-fourth of a house belonging to him, and to give him a house and stated monthly allowance for a certain period. Plaintiff introduced

a written instrument and evidence of acts and declarations of his father, now deceased, tending to establish a verbal agreement which was not consistent with the written agreement. The evidence showed that the promise of plaintiff to marry was entered into after a valid engagement of marriage had been contracted. The agreement as to the will was uncertain, and showed a discrimination against the other children of the decedent which was manifestly unfair. The evidence of any delivery with the intent that the instrument should be treated as the final settlement of the agreement in favor of plaintiff was uncertain. *Held*, that the complaint would be dismissed.

Action by Abraham H. Sarasohn against Rebecca Kamaiky and others to compel specific performance of a contract. Complaint dismissed.

Abraham Sarasohn, for plaintiff.
Nathan Bijur, for defendants.

GREENBAUM, J. The complaint alleges that pursuant to a duly executed written agreement, dated February 9, 1904, made with his father, Kasryel H. Sarasohn, plaintiff agreed to marry in accordance with his father's desires, to take entire charge for his father of the latter's interest in a certain newspaper publishing business during his contemplated absence in Europe during the spring of 1904, and to cancel a certain mortgage which the plaintiff held on the property known as No. 184 East Broadway, and that by reason of the foregoing considerations the said Kasryel H. Sarasohn agreed to execute a valid last will and testament bequeathing to plaintiff one-fourth of the "said business of printing newspapers," and devising to him "one-fourth part of the house known as No. 185 East Broadway, borough of Manhattan," and until the plaintiff acquired a share in said business that he was to be provided by his father, without charge, suitable apartments and an office in the premises known as No. 187 East Broadway, and given a monthly allowance of $100. It is further alleged that said Kasryel H. Sarasohn died on January 12, 1905, without leaving a duly executed last will and testament, and without performing his part of the agreement as aforesaid. It is sought by this suit to compel the legal representatives and heirs of the deceased Sarasohn specifically to perform the agreement above described.

In support of the allegations of the complaint the plaintiff introduced in evidence as the contract upon which he relies a paper writing in the Hebrew language, signed by Kasryel H. Sarasohn and plaintiff, dated February 9, 1904, and witnessed by a rabbi named Widrawitz. This alleged agreement is a very crude document, and as its translation into English by plaintiff's witness was not accepted in its entirety by defendants, who tendered proof in contradiction of plaintiff's translation, I am prepared to find that the following is a substantially correct literal translation of the writing in question:

"Memorial words concluded between Rabbi K. H. Sarasohn and his son Chaim (Hyman): (1) Rev. K. H. Sarasohn obligates himself to give his son above mentioned, after his wedding, which will take place shortly with his bride-elect, the sum of one hundred dollars each and every month, besides suitable apartments and office in his house, No. 187 East Broadway, without charge. This obligation shall continue as long as the above-named Hyman has not a share in the business of publishing newspapers of the said Rev.

K. H. Sarasohn. (2) In the coming spring the said Rev. K. H. Sarasohn will go to Europe. The entire period which he shall remain in Europe his said son shall stand in the place of his father to give (or express) his opinion in the said business of publishing newspapers above mentioned, but in all matters relating to politics and Socialism he shall not have any say. (3) The Rev. K. H. Sarasohn obligates himself to make a will, as is required, that after the passing away of the days and years (obviously referring to the death of K. H. Sarasohn) there shall be to the said son Hyman, above mentioned, twenty-five per cent. of the said business of printing newspapers. This share is only to Hyman personally or to his descendants; but if, God forbid, it shall happen that said Hyman shall have no children surviving him, his wife shall not inherit, only the other heirs of the said Rabbi K. H. Sarasohn. And the house 185 East Broadway there shall be to him one-fourth part. (4) If, after the passing away of the days of the Rev. K. H., there will not be left of him with that to satisfy the three grandchildren of my daughter, Rebecca, of blessed memory, then it is the obligation of the said Hyman to satisfy each with the sum of $2,000 or to give them five per cent. of the said business of publishing newspapers. (5) All the mortgage that the said Hyman holds on the mother shall be at once void (or shall be canceled). All this is concluded in the presence of the undersigned. We, the undersigned, have accepted all the foregoing with our good will, with a perfect understanding, and with a full and settled mind. We have come to this signature the twenty-third of the month of Schebat, 5664, here in New York."

The deceased, Kasryel H. Sarasohn, left him surviving as next of kin and heirs his widow, Bertha Sarasohn, two sons, the defendant Ezekiel Sarasohn and the plaintiff, and Rebecca, Israel, and David Kamaiky, three children of a deceased married daughter, Rebecca Kamaiky. All the parties are of full age, excepting the three above-mentioned grandchildren, each of whom is under the age of 14 years. At the time of his death Kasryel H. Sarasohn owned a one-third interest in the business of the firm known as "Sarasohn & Son," a copartnership engaged in the publication of two newspapers, to wit, the Jewish Daily News and the Jewish Gazette. The copartnership consisted of the deceased Sarasohn, his son Ezekiel Sarasohn, and his son-in-law, Leon Kamaiky, each having an equal undivided share. In addition to his interest in the business of the firm, the deceased was possessed of 87 shares of the capital stock of the corporation known as the Jewish Press Publishing Company, which was engaged in the publication of two newspapers known as the Jewish Morgen Journal and the Jewish Abend Post. The total number of shares issued by the corporation was 390, so that the deceased owned less than one-fourth of its entire capital stock. Besides the assets above described there was other property of which the deceased died seised and possessed, and for the purposes of this determination it was stipulated that the value of the one-third interest in the business of Sarasohn & Son was to be deemed as $94,000, making the total value of said business as $282,000, the value of the 87 shares of the Jewish Press Publishing Company as $8,700, and the value of the entire estate as $140,700.

The effect of a specific performance of the contract in accordance with plaintiff's claim would be to award an amount equal to one-fourth of the total value of the business of publishing newspapers in which Kasryel H. Sarasohn was engaged; that is to say, one-fourth of $282,000 (value of "Sarasohn & Son" business), $70,500; 87 shares of Jewish Press Publishing Company, $8,700; in all the sum of $79,200. As the next of kin the plaintiff would also be entitled to share in two-

ninths of the balance of the estate; that is, in $61,500, or $13,444, giving him a total in his father's estate of $92,644, and leaving $48,056 for distribution to the widow, who, it is estimated, would be entitled to about $20,000 thereof, $13,500 to the son Ezekiel, and $13,500 to the three grandchildren. In other words, the plaintiff's share would be nearly seven times as much as that of his brother Ezekiel, or of his sister's children. The relations between the deceased and his son Ezekiel and his grandchildren were not claimed by plaintiff to have been strained or marred, and, on the other hand, it was affirmatively shown by defendants that they were entirely amicable, and, so far as the children of deceased's daughter were concerned, very affectionate.

The history of the newspaper enterprises in which the deceased was engaged may be briefly stated. He started the publication of the Jewish Gazette in 1874. At that time neither the plaintiff nor his brother Ezekiel was in this country. The plaintiff arrived here in 1877, at about the age of 6 years, Ezekiel having preceded him in 1876 at the age of 10 or 11 years. When a boy plaintiff worked in the business, doing errands, setting type on occasions, getting advertisements, and helping in other ways. Meanwhile plaintiff attended school and for a time college, and in 1889 graduated from the law department of the University of the City of New York. He was subsequently admitted to the bar, and since then has been continuously practicing his profession. He also performed legal services for his father and his father's firm from time to time, as is evidenced by the fact that an action is now pending against the surviving members of the firm to recover a claim for $14,000 for alleged services. It is apparent that Ezekiel, since boyhood, was actively connected with his father in business, and that his son-in-law, Kamaiky, became connected therewith in 1889, when he married plaintiff's sister. In January, 1900, the plaintiff, as lawyer of the parties, prepared w. aei articles of copartnership between the deceased Sarasohn, his son Ezekiel, and his son-in-law Kamaiky, continuing for 10 years the then existing copartnership and defining their interests as equa'. It is also sufficiently shown by the proofs that the business became a prosperous and profitable one during the years when Ezekiel Sarasohn and Leon Kamaiky were actively connected with it.

Outside of the testimony of third parties relating to conversations with Kasryel H. Sarasohn, in which they stated they referred to plaintiff's plea to them of his financial inability to consummate his marriage, there was no direct testimony proffered as to the actual financial condition of the plaintiff either before or since his marriage. It is a familiar rule in equity jurisprudence that specific performance will not be decreed where the agreement sought to be enforced is "unfair, inequitable or unjust" (Phalen v. United States Trust Co., 186 N. Y. 178, 78 N. E. 943), and, further, that "it is one of the prerequisites to the specific performance of an agreement that it shall be clearly proved and certain as to its terms" (Winne v. Winne, 166 N. Y. 267, 59 N. E. 832, 82 Am. St. Rep. 647). It should also be remembered that the alleged contract, so far as it depends upon the consideration of plaintiff's marriage, must be in writing to meet the requirements

of the statute of frauds, a defense here specifically pleaded. Will the paper writing in question, considered in the light of the attendant circumstances, meet the tests that would justify a court of equity in decreeing specific performance?

The complaint treats this writing as a contract—as the contract to be specifically performed. In plaintiff's brief it is also spoken of as a memorandum, sufficient as evidence to satisfy the statute of frauds. If a complete contract, the proofs offered, so far as they tend to vary it, would clearly be inadmissible. If a mere memorandum, the evidence of a previous parol agreement would be admissible. The testimony as to declarations of the deceased Sarasohn was evidently offered by plaintiff, either to show the circumstances under which the paper writing was signed in explanation of any doubtful or ambiguous language employed therein, or else as evidence of a pre-existing parol agreement. In my opinion this testimony adds little, if anything, to plaintiff's case. So far as it tends to establish a parol agreement it utterly fails. The testimony upon this branch of the case consists of that given by the witnesses Apfelbaum, Gellert, Shapiro, and Bertha Sarasohn. Apfelbaum is an uncle of plaintiff's wife, and he states that he had conversations with the deceased, one of them before and others after plaintiff's engagement to his niece, and that on no occasion was a third person present. At the first of these interviews plaintiff's father "promised to give Mr. Abraham H. Sarasohn his part in the business, because he says that Abraham H. Sarasohn should get married to the young lady." He further testified that six weeks after the engagement—

"the old gentleman asked me why he did not send out the invitations for the wedding. I told him, in case he does what he promised before and does not put it in writing, nothing will come of it; so the other time, two weeks later, he asked me again, and he said that he has done whatever he promised in writing."

It is not clear whether the first of these conversations was the occasion when the alleged parol agreement was made, or whether it was a mere declaration of plaintiff's father to this witness of a previous agreement. It was probably the latter, because it is not shown that Apfelbaum represented plaintiff or the bride, or that he was then negotiating an agreement. As an admission it is open to all the criticisms to which admissions are usually subject. Such testimony is properly regarded as of little probative value, unless clear and convincing, and it should be subjected to the closest scrutiny and criticism. It will be observed that this witness states that the deceased promised to give plaintiff "his part in the business," and that he was subsequently told that this had been done. As matter of fact the paper writing does not pretend to give the son "his part of the business," but only a portion of "his part." The admission is, therefore, indefinite and uncertain, and, considering the manner in which the testimony was given, it is to my mind wholly unsatisfactory and unreliable as evidence of the agreement upon which this suit is based.

We next come to the testimony of Gellert, who had been an employé of the deceased. He refers to a conversation with Kasryel H. Sara-

sohn after plaintiff's engagement, in which, after inquiring of the witness, "Why doesn't Hyman marry?" he says:

"I told him, 'Do you know Hyman is saying all the time he cannot make enough out of his professional life, and he would like to have a share or interest in the Jewish Daily News and the Jewish Gazette?' and he told me, 'You go to him and tell him that I will give to one child, to Ezekiel, one share, and my part will not be given to anybody, and I will not give that to any one except I give it to him.'"

The witness then testified to subsequent conversations, in one of which the deceased "stated the same thing, 'Just go and tell him that he shall go and put in the invitations, and put a time for the marriage, and then I will give it to him just as I promised,'" and then he testified to a final conversation, in which, after the witness had stated he had repeated to plaintiff what had been previously told him by the deceased as follows:

"I came over to him and told him that Abraham told me that he is not in a position to get married now, because he does not make enough from his practice, except that you do just as you promised me, as you told Abraham— that you will give him your share in the Jewish Daily News and the Jewish Gazette, and he told me, 'Go tell him that I do not like to make any will while I am alive, and I don't want to go to any lawyer.' He used to be afraid all the time death in making a will, and he told me, 'Go, tell Abraham I will make a Jewish writing, that the third part of my business, of my share, I will give to him after I will die.'"

Here again we find that the alleged statements to Gellert do not correspond with the paper writing, which does not purport to give plaintiff the share of the deceased in the Jewish Daily News and the Jewish Gazette. This testimony is also open to the criticism that the reference to Ezekiel getting one share is meaningless, as Ezekiel was the owner in his own right to a third share in the publications referred to. It is also somewhat singular that, if the deceased had made a previous parol agreement with his son, he should have had so many conversations with third parties, and, in the case of Gellert, to have requested him to convey his promises to his son, although the latter was then residing next door to the building in which the newspaper business of the deceased was being conducted. It is also somewhat strange that the deceased should have said he "does not like to make any will," but that he would "make a Jewish writing," and yet we find that this "Jewish writing" specifically refers to the making of a will, and that he subsequently unsuccessfully attempted to make a will.

We now come to the testimony of Jennie Shapiro, the mother of plaintiff's wife. She testified that about four or six weeks after her daughter's engagement she called upon the elder Sarasohn at his request, and that he then and there asked her when the day would be set for the marriage. "I said I could not tell him, because his father promised before that he would give him a quarter interest in his business to his son," and he said to me:

"You can tell my son in my name I give him a quarter interest in my newspaper business, and he set the date of the marriage, and he said that within a few days he will write the papers out, and he will fulfill all his promises, one-quarter in the newspaper business."

In this conversation it will be observed the father referred to "a quarter interest in his newspaper. business," a statement somewhat at variance with that made to the other two witnesses. And again we find the father asking a third person to tell his son what he would do.

Bertha Sarasohn, the wife of the deceased and the mother of plaintiff, simply testifies to the fact that her husband, after her son's marriage, paid him $100 a month and gave him an office and a residence, and checks in corroboration of her testimony were produced upon the trial.

The testimony of the witnesses above mentioned is not of that satisfactory or convincing nature as would enable a court to determine what, if any, parol contract had been made before plaintiff's engagement between the deceased Sarasohn and his son, and it is manifestly insufficient to establish the contract embodying the terms set forth in the complaint. We are thus necessarily remitted to a consideration of the paper writing itself to determine whether it is a valid agreement, and, if so, whether it should be specifically enforced. Analyzing the document, we find that the deceased obligates himself first to give his son $100 monthly and suitable apartments and office "after his wedding, which will take place shortly." There is no mention of a promise made before the engagement to marry. There is no suggestion that the promise is based upon the consideration of plaintiff's promise to marry. It rather suggests a unilateral agreement on the father's part to do something for his son after his wedding. The document next refers to a contemplated trip of the deceased to Europe, and makes a declaration that plaintiff "shall stand in his father's place to express his opinions" in the publication business, etc. This is urged as a sufficient consideration to uphold the agreement to make a will in plaintiff's favor. It needs very little to convince me that such a claim is wholly without merit. The deceased was a member of a copartnership, a fact of which plaintiff was peculiarly aware, since he himself prepared the written articles of copartnership. Unless the partners were willing to receive plaintiff's opinions the arrangement in that regard was valueless. There is nothing to indicate that the interests of the deceased would be advanced by having plaintiff stand in his place during his temporary sojourn abroad, and the inference is a reasonable one that the clause was designed to confer a favor or privilege upon plaintiff, having in mind, possibly, his future expectancy of a share in the publications. In any event this would not afford any adequate consideration for the agreement claimed.

Finally, it is urged that the fifth subdivision of the document expresses a consideration, in that a mortgage held by plaintiff was to be canceled or become void. The history of this mortgage, as shown by the proofs, leads me to doubt if plaintiff ever legally owned this mortgage, or as to whether it ever was founded upon any consideration; but, assuming that in some way this plaintiff had it in his power to put the owners of the fee which this mortgage covered to considerable trouble in securing its cancellation, and that this would be in law a consideration, the question arises. would such a consideration be deemed adequate, sufficient, or of such a character as to permit a court of equity to recognize it in support of the alleged agreement here

sought to be enforced? I apprehend not. Besides, it may be said with convincing force that after all the amount of the mortgage was intended to go in reduction of plaintiff's share under the alleged agreement, and not as forming an independent consideration to uphold it. I may further add that as matter of fact the plaintiff failed at once to cancel the mortgage, as he would have been obliged to if the writing was to have been treated as a consummated agreement between himself and his father. The mortgage was only satisfied after his father's death, and, even though this was done at his brother's request, that fact may not affect the rights of the infant defendants. If I am correct in my conclusions, the only consideration that would be left upon which to uphold the paper writing as an agreement is that of plaintiff's marriage. Many authorities have been cited pro and con upon the sufficiency of such a consideration. Were I to consider the numerous cases upon this point, this opinion, which is already of greater length than I had intended, would stretch out beyond reasonable limits. Hence I will forbear indulging in a review of these cases and content myself with a statement of the conclusion at which I have arrived concerning them.

It is important to differentiate the cases under this point that refer to marriage settlements and agreements made before or at the time of the promise to marry from those made after the existence of a valid promise to marry. In the former class of cases there seems to be no doubt that the consideration of marriage is adequate. In the latter there is considerable doubt, and, in my opinion, the weight of authority is with those that hold that a unilateral promise to a party based upon the performance of an existing obligation of that party is invalid. I am aware that the Court of Appeals has, in the case of Hamer v. Sidway, 124 N. Y. 538, 27 N. E. 256, 12 L. R. A. 463, 21 Am. St. Rep. 693, and in the recent case of Phalen v. United States Trust Co., supra, cited with apparent approval the English case of Shadwell v. Shadwell, 30 L. J. C. 145, which by some writers is claimed to uphold the doctrine for which plaintiff contends. Nevertheless, I think that, if our court of final resort would have had direct occasion to consider the full effect and meaning of that decision, it would not have given to it the apparent sanction of authority. The Shadwell Case does not appear to have received a specially critical consideration on the part of the court. It may be sufficient to dismiss the Shadwell Case by referring to a well-considered discussion of that case and of the questions here involved in a recent publication known as Sweet's Foundations of Legal Liability, vol. 2, c. 12, at pages 107, 112, 114 et seq. It appears to me also important, when studying the cases bearing upon the consideration of marriage, to distinguish between executory and executed contracts. In the case of Kramer v. Kramer, 90 App. Div. 176, 86 N. Y. Supp. 120, reversed in 181 N. Y. 477, 74 N. E. 474, the views of the Appellate Division evidently treated the contract sued upon as an "executed" one. Page 182 of 90 App. Div., page 129 of 186 N. Y. Supp.

But, aside from the lack of consideration to support the alleged agreement, it seems to me it is too uncertain and too indefinite in its meaning to make it effective. Plaintiff claims that it was designed to

give him 25 per cent. of the value of all the newspaper enterprises in which his father was interested. Defendants contend it could only mean 25 per cent. of his interest in these various business undertakings. As already shown, if the Jewish Press Publishing Company is to be included, then we have the anomaly of the father agreeing to give 25 per cent. of a business in which he owned less than 25 per cent. Construing the meaning of the language of the document in the light of the surrounding circumstances, why should the father have discriminated so strikingly against his other son and the children of his deceased daughter in favor of the plaintiff? His relations toward his partners were cordial and sympathetic, and his affection for his grandchildren seems to have been strong. And yet there is considerable force in the argument that the deceased must have meant 25 per cent. of the entire value of the business, because in subdivision 4 of the paper writing he evidently realizes the contingency that there may be little, if anything, left for his grandchildren, a reasonable apprehension, after giving up an amount equal to 25 per cent. of the value of the entire business and after payment of his debts. But, if the true meaning of the writing was to give up practically his entire estate to one child, to the exclusion of the others, without any apparent good reason for so doing, then one is forced to the conviction that it is so manifestly unfair and unjust that a court of equity will not decree its specific performance.

Plaintiff claims that the instrument, which was evidently intended as his last will and testament, and which could not be probated because it lacked due execution, is corroborative of the intention of the deceased to give to plaintiff the share in his business as contemplated in the alleged agreement. But a perusal of this attempted will shows that the deceased desired to give "10 per cent. of all his estate" to charity, and of the remaining portion 20 per cent. to plaintiff and the "balance of 13⅓ per cent." to be divided, one half to his son Ezekiel and the remaining half to his three grandchildren. The result sought to be accomplished is inexplicable. If he had in mind a division of his interest in the business, which he states is 33⅓ per cent., then the addition of 10 per cent., 20 per cent. and 13⅓ per cent., making 43⅓ per cent., renders it impossible to reconcile the division upon that theory. If he had in mind the division of his entire estate into the fractions mentioned by him, then a considerable portion of his estate, would be undisposed of, and the results for which plaintiff strives would be defeated. Neither of these constructions tends to uphold the terms of the alleged agreement.

Another feature of the case that strongly forces itself upon one is that, if the paper writing is to be treated as a complete agreement, the evidence would not warrant a finding that it was intended to be treated as a final, consummated act of the deceased. At the time of the decease of Kasryel H. Sarasohn the instrument in question was in the custody of Rabbi Widrawitz. The plaintiff, it is true, had what appears to be a copy of the original; but the copy was not signed as an agreement by the father and son. It was merely an acknowledgment by the father's signature of a copy of the writing in the custody of Rabbi Widrawitz. Why had not the original been delivered to

plaintiff? Widrawitz, although in court, was not called as a witness. Plaintiff argues that no unfavorable presumption may be indulged in from his failure to produce this witness, because it did not appear in what relation he stood toward him. Granting this, it nevertheless remains that no proof is tendered from which the court would be warranted in finding that delivery of the document to Widrawitz was intended to be treated as the final, conclusive consummation of the agreement in favor of the plaintiff. The burden of proving his case rests upon the plaintiff, and this he has not successfully borne. If the document be regarded as a mere memorandum, and, therefore, not requiring proof of a delivery to plaintiff, then, as already shown, there is no competent proof of a pre-existing parol agreement.

Passing upon the reserved objections to testimony I find it unnecessary, in view of my conclusions, to sustain those taken by defendants. As to those of the plaintiff, I have decided to uphold the objections to the testimony of the witness Kram, so far as it relates to conversations with the deceased, Sarasohn, as to alleged statements made concerning the plaintiff, and, indeed, the court of its own motion strikes out all the testimony of this witness as to conversations with the deceased touching upon the plaintiff's acts or attitude toward him or as to his intentions about making a will. The same disposition is made with respect to the testimony of the witness Paley so far as it refers to conversations with the deceased relative to plaintiff. Viewing the case in all the aspects that have been considered, I am of opinion that plaintiff has failed to establish a cause of action. The complaint is dismissed upon the merits, with costs.

Complaint dismissed, with costs.